FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

OCT 15 2009

JAMES N. HATTEN, CLERK
By: _____ Deputy Clerk

# United States Court of Appeals
## For the Eleventh Circuit

No. 08-10080

District Court Docket No.
02-00018-CR-CC-4-1

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT

Jun 29, 2009

THOMAS K. KAHN
CLERK

UNITED STATES OF AMERICA,

　　　　　Plaintiff-Appellee,

versus

JAVADO BARNER,

　　　　　Defendant-Appellant.

A True Copy Attested
Clerk U.S. Court of Appeals,
Eleventh Circuit

By: _____
Deputy Clerk
Atlanta, Georgia

----------------------------------------------------------------
Appeal from the United States District Court
for the Northern District of Georgia
----------------------------------------------------------------

## JUDGMENT

　　It is hereby ordered, adjudged, and decreed that the attached opinion included herein by reference, is entered as the judgment of this Court.

ISSUED AS MANDATE
OCT 14 2009
U.S. COURT OF APPEALS
ATLANTA, GA.

Entered:　　June 29, 2009
For the Court:　Thomas K. Kahn, Clerk
　　　By:　　Clark, Djuanna

FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

[PUBLISH]

OCT 1 5 2009

JAMES N. HATTEN, CLERK
By: _____ Deputy Clerk

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 29, 2009
THOMAS K. KAHN
CLERK

No. 08-10080

D. C. Docket No. 02-00018-CR-CC-4-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JAVADO BARNER,

Defendant-Appellant.

Appeal from the United States District Court
for the Northern District of Georgia

(June 29, 2009)

Before BIRCH and BARKETT, Circuit Judges, and KORMAN,* District Judge.

KORMAN, District Judge:

_____

*The Honorable Edward R. Korman, Senior United States District Judge for the Eastern
District of New York, sitting by designation.

Javado Barner appeals from a judgment, entered upon a jury verdict, convicting him of one count of possession of MDMA, commonly known as ecstasy, with intent to distribute, in violation of 21 U.S.C. § 841(a)(1). The ecstasy, which was the subject of the count of conviction, was obtained in one of a series of home invasions in the Atlanta area that were committed by Barner and his co-conspirators. While he did not personally participate in the home invasion from which this ecstasy was stolen, he was provided with some of it for the purpose of distribution.

The basic facts underlying Barner's conviction are fairly simple. Nevertheless, the case has had a long and complicated procedural history, including his withdrawal of a plea of guilty to the fourth superseding indictment and a successful appeal by the United States from an order of the district court dismissing the fifth superseding indictment on the ground that "the facts of this case warranted a presumption that [it] resulted from prosecutorial vindictiveness." *United States v. Barner*, 441 F.3d 1310, 1312 (11th Cir. 2006). We presume familiarity with the factual and procedural history, and describe it below only to the extent necessary to address the issues raised in this appeal.

## DISCUSSION

Barner challenges the district court's admission of certain confessions and

2

statements, the denial of his motion to dismiss the fifth superseding indictment on the ground it was motivated by actual vindictiveness, and the sufficiency of the evidence. He also raises five separate claims of error relating to his sentence and the application of the Sentencing Guidelines. While we affirm the judgment of conviction, we remand the case for resentencing.

## A. The Pretrial Motions

Barner first argues that the district court erred in denying his motion to suppress certain confessions and admissions that he had made on December 19, 2001, December 31, 2001, and February 26, 2002. Although his brief on appeal argues that the district court erred in admitting "four of Barner's statements at trial," the brief does not identify or address the fourth statement that he claims was erroneously admitted. We observe that Barner's arguments in support of the motion to suppress were addressed in the thorough and comprehensive report and recommendation of the U.S. magistrate judge, which was filed after an evidentiary hearing and which the district judge adopted. Because we agree that Barner's motion to suppress was properly denied, we address here only those arguments that require some additional discussion.

## The December 19, 2001 Statement

On December 19, 2001, while incarcerated for an unrelated crime, Javado

3

Barner was visited at the Clayton County Jail by Craig Kailimai, of the Atlanta Police Department, then assigned to the Bureau of Alcohol, Tobacco & Firearms. During this interview Barner provided Kailimai with information about several home invasions in the Atlanta area and about his own possession of ecstasy. While Barner denied personal involvement in any of the home invasions, he did admit to having received ecstasy, taken from the home of Michael Ogburn by one of the home invasion participants, which Barner intended to distribute. Although Barner was given his *Miranda* warnings and signed an acknowledgment that he understood his rights and that he was willing to waive them, he claims that he was not fully advised of the nature of the crime about which he would be questioned. Specifically, he contends that the waiver of his *Miranda* rights was not knowing and voluntary because Kailimai failed to advise him that he was actually conducting a drug investigation, rather than a home invasion investigation. This argument is without merit.

The dichotomy between the home invasion investigation and the drug investigation is artificial. In committing the home invasion robberies, Barner and his co-conspirators targeted drug dealers. Indeed, the indictment alleged that "[t]he conspiracy was to obtain . . . drugs, firearms, money and other valuables, and to distribute the drugs and other valuables for profit." More significantly, the

4

Supreme Court has "never read the Constitution to require that the police supply a suspect with a flow of information to help him calibrate his self-interest in deciding whether to speak or stand by his rights." *Moran v. Burbine*, 475 U.S. 412, 422 (1986); *see also Colorado v. Spring*, 479 U.S. 564, 576-77 (1987). Rather, he must simply be aware that he may remain silent and request a lawyer, and that his statements may be used against him. *Moran*, 475 U.S. at 422-23. These rights were explained to Barner in the course of a tape-recorded interview. Consequently, the December 19 statement was properly admitted. *See Agee v. White*, 809 F.2d 1487, 1494-95 (11th Cir. 1987).

**The December 31, 2001 Statement**

After the December 19, 2001 interview, Barner regularly called Kailimai to provide further information and express his continued interest in cooperating. The following testimony captures the flavor of what was essentially a dialogue that continued after the December 19 interrogation:

> Assistant U.S. Attorney: And did Mr. Barner continue to try to give you information about Johnathan Dale and the other defendants in the case?
>
> Kailimai: Yes, he had a willingness. He continued to want to give information so much that he advised me that he would provide names or possible—I think it was possible names and locations of other people that the robbery crew had done home invasions on.
>
> Q: And, so, after Mr. Barner made that offer to provide you with names and

5

locations, did you then go talk to him again at the Clayton County Jail on December 31st of 2001?

A: Yes. I—during one of the conversations, when he said he could provide that, I'd asked him to try and work on it and try to prepare something, and then I would return. And, then, I did return on December 31st and obtain that information.

Barner himself testified that the December 31 meeting with Kailimai took place in the visitors' booth, and that they "talked between the glass to each other, and the first thing, like he said, he asked me did I have the list, and I think I pulled out the list and gave him the names that were on the list." The meeting was "real short."

Barner alleges that his December 31, 2001 statement was taken improperly without *Miranda* warnings and in violation of his Sixth Amendment right to counsel. Nevertheless, he does not support this claim with any legal argument or citation of authority. We reject his *Miranda* claim, because Barner had earlier been advised of his rights, and there was no need to do so at a subsequent interview which he initiated.

While "there is no requirement that an accused be continually reminded of his rights once he has intelligently waived them," *Biddy v. Diamond*, 516 F.2d 118, 122 (5th Cir. 1975), a delay of twelve days between interrogation sessions without repetition of the *Miranda* warnings would give us some pause. Indeed, in *Biddy v. Diamond*, upon which the U.S. Attorney relies, the defendant was asked

whether she remembered the rights that had been administered twelve days earlier, and she responded that she did. *Id.* Because of this acknowledgment, the Fifth Circuit held that "a further delineation . . . of [the defendant's] rights, which she had stated that she understood from prior explanations, would have been needlessly repetitious." *Id.*

Barner made no such acknowledgment. Nevertheless, other circumstances obviated the need for the reiteration of the *Miranda* warnings. Of particular significance is the fact that the December 31 interview was initiated by Barner, and was conducted under circumstances that would not ordinarily require *Miranda* warnings. Although Barner was in jail on another charge at the time, a form of custody that would generally require the administration of the *Miranda* warnings, *Mathis v. United States*, 391 U.S. 1, 5 (1968), "incarceration does not *ipso facto* render an interrogation custodial," *Leviston v. Black*, 843 F.2d 302, 304 (8th Cir. 1988). *See also Illinois v. Perkins*, 496 U.S. 292, 299 (1990) ("[t]he bare fact of custody may not in every instance require a warning even when the suspect is aware that he is speaking to an official."). On the contrary, "in various settings, the interrogation of jail and prison inmates has been held not to be subject to *Miranda*." 2 Wayne R. LaFave et al., *Criminal Procedure* 724 (3d ed. 2007).

One such setting is where an incarcerated defendant "initiated the police

inquiry," the interview "arose out of [his] desire to speak with the police about the [offense]," and the interview took place, not in a jail cell, but under circumstances which suggested that the defendant was free to terminate the conversation. *Leviston*, 843 F.2d at 304. The reason for this exception derives from the purpose of the *Miranda* warnings. As the Supreme Court has explained in an analogous context, *Miranda* warnings are required because a "[c]ustodial arrest is said to convey to the suspect a message that he has no choice but to submit to the officers' will and to confess. It is unlikely that a probation interview [to which the probationer was compelled to submit], arranged by appointment at a mutually convenient time, would give rise to a similar impression." *Minnesota v. Murphy*, 465 U.S. 420, 433 (1984) (internal citation omitted).

While Barner was incarcerated and not on probation, he was not compelled to submit to the meeting with Kailimai. Nor did the circumstances convey to Barner the message that "he ha[d] no choice but to submit to the officers' will and confess." *Id.* On the contrary, Barner initiated the interview because of his desire to cooperate, the interview took place in the visitors' room where he was separated from Kailimai by a glass window, and the interview was brief. Indeed, the non-coercive atmosphere of the interview was captured by the following testimony of Barner:

> Q: Besides no *Miranda*, do you think there was anything coercive or involuntary about that meeting that you would like to add for the court?
>
> A: No, it was real short. Like I say, I just gave him a list that he came and asked for it and he went on, told me, if I'm not mistaken, told me keep in contact, keep calling him.

In sum, as we have held in comparable circumstances, there was no need for Kailimai to readminister *Miranda* warnings after he had previously done so on December 19, 2001. *See Huckelbury v. Wainwright*, 781 F.2d 1544, 1545 (11th Cir. 1986).

Nor is there any merit to Barner's Sixth Amendment claim. On this score, we have little to add to the thoughtful discussion of this issue by the United States magistrate judge, who rejected this argument on the ground that, because "adversary judicial criminal proceedings" against Barner had not been commenced, his Sixth Amendment right to counsel had not yet attached. *Kirby v. Illinois*, 406 U.S. 682, 689-90 (1972); *McNeil v. Wisconsin*, 501 U.S. 171, 175 (1991) ("[t]he Sixth Amendment right . . . is offense specific. It cannot be invoked once for all future prosecutions, for it does not attach until a prosecution is commenced.").

**The February 26, 2002 Statement**

On February 26, 2002, after his attorney had entered into a proffer agreement with the U.S. Attorney, Barner rode around the Atlanta area with federal agents to

9

point out several homes the robbery crew had invaded, including the home of ecstasy dealer Michael Ogburn, from which the crew had taken the ecstasy given to Barner to sell. Barner challenges the use of evidence obtained during this drive-around. Specifically, he argues that he had never been provided with a copy of the proffer agreement and that his attorney was incompetent for having agreed to it.

We need not reach this issue, because our review of the record persuades us that Barner's cooperation preceding the February 26 drive-around provided compelling evidence of his guilt of possession of ecstasy with intent to distribute—the count of conviction. Indeed, in the course of arguing that the district judge erroneously denied him a three-point reduction for acceptance of responsibility, Barner's counsel relied on the fact that "Barner confessed on December 19, 2001, while crying, to possessing MDMA—his crime of conviction." Barner also described the manner in which the MDMA, or ecstasy, was obtained by his co-conspirators, the names of the individuals who stole it during the course of a home invasion, and the neighborhood in which it occurred. Indeed, after the interview, Barner called Kailimai to express his desire to continue to provide additional information concerning the home invasions. This cooperation, as earlier noted, involved the preparation of a list of home invasions.

The only evidence obtained during the February 26 drive-around that related

10

to the crime of conviction was the precise address of the home invasion during which the ecstasy that Barner was charged with possessing was stolen. This information was helpful in enabling Kailimai to obtain a report that a burglary had occurred "on that street and address, that the details or the items that were taken from the burglary . . . with the exception, of course, [of] the mention of drugs . . . almost specifically matched details that we had from what was taken during the robberies." While evidence identifying the specific addresses of the home invasions may have been of particular significance to the overt acts alleged in furtherance of the conspiracy charged in Count One of the fifth superseding indictment, and the Hobbs Act counts to which they correspond, it was not of any great consequence to the offense of conviction. Indeed, the only detail that Barner appears to have provided with regard to what was taken in the Ogburn robbery—the amount of ecstasy that was stolen—was *not* corroborated in the police report that Kailimai obtained.

Moreover, aside from the confession, three of Barner's accomplices, who had pled guilty to charges contained in the fourth superseding indictment, testified against Barner at trial. Under these circumstances, even if the evidence obtained during the February 26 drive-around had been suppressed, the other evidence against Barner was overwhelming. Nor was any evidence offered on the defense

11

case to controvert it.  Indeed, referring to the defense summation, the Assistant U.S. Attorney told the jury "there's one thing [defense counsel] didn't tell you.  He talked for 41 minutes and 25 seconds . . . He never said the Defendant didn't do it."  Thus, the admission of the drive-around evidence, even if erroneous, was plainly harmless.

Nevertheless, Barner argues that, because the proffer agreement protected him against "any new charges based upon . . . information" he provided during the drive-around, Count Ten should have been dismissed prior to trial.  This argument fails for the same reason as Barner's claim that the admission of statements that he made during the February 26, 2002 drive-around required the reversal of the jury verdict.  *See Bank of Nova Scotia v. United States*, 487 U.S. 250, 263-64 (1988) (harmless error rule embodied in Fed. R. Crim. P. 52(a) applicable to grand jury proceedings).  Indeed, prior to the holding in *Bank of Nova Scotia* we had held that, even if a grand jury heard immunized testimony, an indictment would not be dismissed if the use of the prohibited evidence was harmless.  *United States v. Byrd*, 765 F.2d 1524, 1529 n.8 (11th Cir. 1985); *see also United States v. Schmidgall*, 25 F.3d 1523, 1529 (11th Cir. 1994).

In sum, because of the compelling independent evidence before the grand jury, Count Ten could not be said to have been based on the information obtained

12

from the drive-around. Nor is this conclusion undermined by the testimony of Kailimai, upon which Barner relies, that "some of the information" obtained during the February 26, 2002 meeting was used to bring "additional charges" in "subsequent indictments" against Barner. These statements did not distinguish between Count Ten—the count of conviction—and the Hobbs Act and 924(c) charges that were added in the fifth superseding indictment and on which Barner prevailed at trial.

This conclusion also constitutes a sufficient answer to Barner's argument that the evidence was insufficient to sustain his conviction. This argument is predicated on the assumption that his confession and admissions should have been suppressed. It fails, if only because the district court properly denied his motion to suppress the December 19 and 31, 2001 confessions and admissions. Moreover, Barner's claim of prosecutorial vindictiveness is also without merit, if only because he was acquitted of the counts added to the fifth superseding indictment, at which his motion was directed.

## B. Sentencing Challenges

Our review of sentences after *United States v. Booker*, 543 U.S. 220 (2005), consists of two elements. First, we consider challenges to the district court's calculation of the advisory Sentencing Guidelines range. Second, we review the

sentence for reasonableness. *See United States v. Williams*, 435 F.3d 1350, 1353 (11th Cir. 2006). "[A]s was the case before *Booker*, the district court must calculate the Guidelines range accurately." *United States v. Crawford*, 407 F.3d 1174, 1179 (11th Cir. 2005). We review the district court's interpretation of the Sentencing Guidelines *de novo* and accept its factual findings unless clearly erroneous. *United States v. Jordi*, 418 F.3d 1212, 1214 (11th Cir. 2005). An error in the district court's calculation of the Sentencing Guidelines range warrants vacating the sentence, unless the error is harmless. *See United States v. Scott*, 441 F.3d 1322, 1329 (11th Cir. 2006). A Sentencing Guidelines miscalculation is harmless if the district court would have imposed the same sentence without the error. *See id.*

The U.S. Attorney argues that we need not reach Barner's challenge to the manner in which the Sentencing Guidelines were applied here, because any error was harmless. Specifically, he relies on the district court judge's statement that

> having weighed and considered the imposition of a sentence in this case under both the [Sentencing Guidelines], as well as the factors outlined in 18 U.S.C. 3553, and the Court having concluded that a sentence under either would be about the same, the Court having decided to impose a sentence of 87 months pursuant to the guidelines because the custody guideline range for this case is fair and reasonable in light of the facts and circumstances surrounding the Defendant's role in this conspiracy.

Where a district judge clearly states that he would impose the same sentence,

even if he erred in calculating the guidelines, then any error in the calculation is harmless. *United States v. Keene*, 470 F.3d 1347, 1349 (11th Cir. 2006). The district judge here made no such statement. Instead, he indicated that the sentence was "pursuant to the guidelines," and the factors outlined in 18 U.S.C. § 3553. This statement does not provide the basis for a holding of harmless error.

Obviously, where the district judge chooses to sentence within the range prescribed by the Sentencing Guidelines, an error in their calculation cannot be harmless. Moreover, even where he chooses to impose a sentence based on the considerations prescribed in 18 U.S.C. § 3553, he must take into account the range prescribed by the Sentencing Guidelines. *See* 18 U.S.C. § 3553(a)(4) (2006). Consequently, the Guidelines range must be calculated correctly in the first instance. *Gall v. United States*, 552 U.S. 38, 128 S.Ct. 586, 597 (2007). Indeed, "[a] misinterpretation of the Guidelines by a district court 'effectively means that [the district court] has not properly consulted the Guidelines.'" *Crawford*, 407 F.3d at 1179, *quoting United States v. Hazelwood*, 398 F.3d 792, 801 (6th Cir. 2005) (alterations in original). Because we cannot say that an error in the application of the Sentencing Guidelines here would be harmless, we proceed to address Barner's challenges to his sentence in turn.

15

**The Withdrawal of the § 5K1.1 Motion**

While four of Barner's five arguments with regard to the sentence involve objections to the manner in which the district judge calculated the guidelines, his first objection does not directly do so. Instead, it goes to the issue of his entitlement to a downward departure. Specifically, Barner argues that the Assistant U.S. Attorney retaliated against him for exercising his Sixth Amendment right to a jury trial by withdrawing the previously-filed § 5K1.1 downward departure motion.

The record shows that, on July 12, 2002, Barner pled guilty to two counts of the fourth superseding indictment—conspiracy to possess drugs with intent to distribute, and possession of firearms in furtherance of that drug conspiracy. The plea agreement contained the following provisions:

> Based on the substantial assistance the defendant has provided in this case, and pursuant to Section 5K1.1 of the Sentencing Guidelines, the Government will file a motion at sentencing recommending that the Court depart downward from the otherwise applicable offense level and will recommend that the defendant be sentenced to a term of imprisonment of 144 months.
>
> * * *
>
> The defendant agrees to continue to cooperate completely and truthfully with the government including but not limited to providing testimony at trial. If the defendant fails to cooperate truthfully and completely, or if the defendant engages in additional criminal conduct or other conduct inconsistent with cooperation, he will not be entitled to any consideration whatsoever pursuant to this and the preceding paragraphs.

On December 4, 2002, Barner moved to withdraw his guilty plea, because of

16

the ineffective assistance of counsel.  Nevertheless, two days later, the Assistant

U.S. Attorney filed a § 5K1.1 downward departure motion based upon Barner's

"substantial" assistance to the government during its investigation.  On February

18, 2003, the district court permitted Barner to withdraw his guilty plea.  A fifth

superseding indictment, containing the following charges, was then returned:

Count One, conspiracy to possess, with intent to distribute, drugs; Counts Two,

Four, Six, and Eight, attempt to affect interstate commerce by robbery; and Count

Ten, possession with intent to distribute ecstasy.  Barner offered to plead guilty to

Count Ten, but the Assistant U.S. Attorney refused to dismiss the remaining

counts.

Barner proceeded to trial.  After the case-in-chief, the district court directed a

verdict of acquittal on Counts Two through Nine, permitting only Counts One and

Ten to be submitted to the jury.  The jury returned verdicts of not guilty on Count

One and guilty on Count Ten.  On December 6, 2007, the Assistant U.S. Attorney

successfully moved to withdraw his previously-filed § 5K1.1 downward departure

motion.

It is well-established that, "[t]o punish a person because he has done what

the law plainly allows him to do is a due process violation of the most basic sort."

*United States v. Goodwin*, 457 U.S. 368, 372 (1982) (internal quotations omitted).

Thus, while the U.S. Attorney may refuse to file a § 5K1.1 motion for several reasons and has considerable discretion to do so, *United States v. Nealy*, 232 F.3d 825, 831 (11th Cir. 2000), "federal district courts have authority to review a prosecutor's refusal to file a substantial-assistance motion and to grant a remedy if they find that the refusal was based on an unconstitutional motive," *Wade v. United States*, 504 U.S. 181, 185-86 (1992).

Where an offer of a § 5K1.1 motion is made "in the give-and-take of plea bargaining, in which [the defendant] was free to accept or reject the prosecution's offer," but the defendant does not substantially assist the prosecution and goes to trial, "there [is] no . . . element of punishment or retaliation, and the government's later refusal to file a § 5K1.1 motion [is] constitutionally permissible." *United States v. Dorsey*, 554 F.3d 958, 961 (11th Cir. 2009) (internal quotations omitted), *vacating United States v. Dorsey*, 512 F.3d 1321 (11th Cir. 2008). But we have not yet had the opportunity to determine whether the subsequent withdrawal of a previously-filed § 5K1.1 motion, as retaliation for a defendant having exercised his Sixth Amendment right to a jury trial, is an "unconstitutional motive" constituting a due process violation under *Wade*. *Dorsey*, 554 F.3d at 961. We need not reach the issue here.

Because the plea agreement obligated the Assistant U.S. Attorney to

18

recommend a sentence of 144 months pursuant to § 5K1.1, and because the district

judge imposed a sentence of only 87 months—a sentence at the bottom of the

Sentencing Guidelines range of 87 to 108 months—the withdrawal of the § 5K1.1

motion was arguably harmless.  Indeed, after *Booker,* a judge basing a sentence

under the considerations outlined in 18 U.S.C. § 3553 may take a defendant's

substantial assistance into account even if a prosecutor withdraws (or does not file)

a § 5K1.1 motion.  *United States v. Fernandez,* 443 F.3d 19, 33 (2d Cir. 2006).

Nevertheless, what concerns us more than the decision of the district judge to

permit the withdrawal of the § 5K1.1 motion is that the Assistant U.S. Attorney

may have misled the district judge as to the nature and extent of Barner's

cooperation.  Specifically, the following explanation was offered for withdrawing

the § 5K1.1 motion:

> The Defendant did stop cooperating with the Government once he withdrew
> his plea and once he denied his involvement in these armed robberies.  The
> Defendant was no longer cooperating . . . and once the Government started
> talking to other cooperators and other coconspirators and determined that the
> Defendant was in fact involved in the armed robberies when he was denying
> that he was early on, the Defendant's assistance to the Government really is
> no longer viable.

The district judge responded only that he "agree[d] with the position taken by the

Government," and that, "in light of the fact that the Defendant did breach the . . .

plea agreement, the Court is going to resolve this issue in favor of the

19

Government." The record, however, flatly contradicts the representations upon which the district judge relied.

First, as the U.S. Attorney observed in his motion for a downward departure, which he filed on December 6, 2002 *after* Barner moved to withdraw his guilty plea:

> The defendant began to cooperate with the government prior to his arrest by giving detailed information regarding the home invasions to agents of the Bureau of Alcohol, Tobacco, and Firearms, (ATF). After his indictment, the defendant continued to cooperate with the government.

> The defendant was debriefed again by agents. More importantly, the defendant took agents to several locations where home invasions previously unknown to the agents had occurred. The defendant also gave specific information to the agents which implicated several of his co-defendants. Even though the defendant did not testify in the grand jury, the information he provided was relied on in obtaining an indictment against some of his co-defendants. The defendant also discussed other crimes which had been committed by his co-defendants.

> The Government considers the defendant's cooperation to be substantial.

Second, while Barner did initially deny his participation in the home invasions, he admitted his involvement by March of 2002. The § 5K1.1 motion was not filed until December 2002—nine months later—indicating that Barner's initial lack of candor did not undermine his "substantial" cooperation.

Moreover, notwithstanding the claim that Barner "stop[ped] cooperating with the Government once he withdrew his [guilty] plea," the motion to withdraw

20

the § 5K1.1 application did not point to any assistance Barner refused to provide after December 2002. Indeed, at oral argument on the instant appeal the Assistant U.S. Attorney conceded that downward departure motions such as the one in this case are not typically filed until cooperation is deemed complete. Significantly, the Assistant U.S. Attorney, who filed the § 5K1.1 motion and who tried the case, testified that "Mr. Barner's cooperation had been completed by the time he pled guilty," and that she "filed a motion on Mr. Barner's behalf because [she] thought that his cooperation with regard to his co-defendants had been substantial." After the guilty plea was withdrawn, she never approached Barner about further cooperation.

Because we are concerned that the statements explaining the reason for withdrawal of the § 5K1.1 application caused the district court to base the sentence on clearly erroneous facts without support in the record, we vacate and remand for resentencing. *Gall*, 552 U.S. 38, 128 S.Ct. at 597 ("[r]egardless of whether the sentence imposed is inside or outside the Guidelines range" the court of appeals "must first ensure that the district court committed no significant procedural error, such as . . . selecting a sentence based on clearly erroneous facts"); *see also United States v. Livesay*, 525 F.3d 1081, 1094 (11th Cir. 2008).

21

## The Application for Acceptance of Responsibility

A remand for resentencing is also required because we agree with Barner that the district court improperly denied him a three-point reduction for acceptance of responsibility.  Pursuant to the Sentencing Guidelines, a district court may reduce a defendant's offense level by two, "[i]f the defendant clearly demonstrates acceptance of responsibility for his offense," U.S. Sentencing Guidelines Manual § 3E1.1(a) (2008), and by an additional point if the defendant assisted authorities in the investigation or prosecution of his own misconduct by "timely providing complete information to the government concerning his own involvement in the offense," U.S. Sentencing Guidelines Manual § 3E1.1(b) (2001).  Although a motion by the U.S. Attorney is now required in order for the defendant to obtain this additional point, U.S. Sentencing Guidelines Manual § 3E1.1(b) (2008), it was not required under the 2001 version of the Sentencing Guidelines in effect when the crime was committed.

While an adjustment for acceptance of responsibility is prototypically applied to cases in which defendants have pled guilty, "[c]onviction by trial . . . does not automatically preclude a defendant from consideration for such a reduction."  U.S. Sentencing Guidelines Manual § 3E1.1 n.2.  Indeed, a defendant may receive an acceptance of responsibility reduction,

22

> *for example*, where a defendant goes to trial to assert and preserve issues that
> do not relate to factual guilt (e.g., to make a constitutional challenge to a
> statute or a challenge to the applicability of a statute to his conduct). In each
> such instance, however, a determination that a defendant has accepted
> responsibility will be based primarily upon pre-trial statements and conduct.

*Id.* (emphasis added); *see also United States v. Rodriguez*, 975 F.2d 999, 1009 (3d

Cir. 1992).

We have a comparably unusual case here. Barner confessed to the factual

elements of the crime of conviction—possession of ecstasy with intent to

distribute—during his first meeting with Kailimai on December 19, 2001, several

months before he was indicted in this case in February of 2002. Briefly, as we

have discussed earlier, Barner volunteered several times that co-defendant Mark

Hill gave Barner ecstasy from the Michael Ogburn robbery for Barner to sell, and

recognized that by making such statements he was implicating himself. After this

initial and lengthy confession, Barner proceeded to cooperate with the government

to provide information as to his co-defendants, even alerting agents to the home

invasion of ecstasy dealer Michael Ogburn—the robbery which resulted in Barner's

sole conviction for possession of ecstasy with intent to distribute.

Significantly, in preparation for Barner's originally-scheduled sentencing

pursuant to his guilty plea, the pre-sentence report recommended that Barner

receive credit for acceptance of responsibility, recognizing that he "stated

23

contrition for his actions.  He was debriefed by agents and agreed to cooperate with the Government in its investigation of this case."   While Barner ultimately withdrew his guilty plea and exercised his right to a jury trial, his actions have not been inconsistent with acceptance of responsibility for possession with intent to distribute ecstasy.

Thus, upon the return of the fifth superseding indictment Barner offered to plead guilty to the sole count of conviction—a fact which the district judge appears not to have considered significant when imposing sentence.  Barner had declined to plead guilty to the full indictment to pursue legal defenses as to the remaining counts—namely, that the conspiracy in which he participated was not a drug conspiracy, and that the Hobbs Act did not apply to his conduct.   He was vindicated when the district court directed a verdict in his favor on Counts Two through Nine, and the jury acquitted him on Count One.  Significantly, Barner did not take the stand in his defense, and never denied having possessed the ecstasy. Indeed, as we have previously observed, the Assistant U.S. Attorney told the jury in his rebuttal summation that "there's one thing [defense counsel] didn't tell you. He talked for 41 minutes and 25 seconds . . . He never said the Defendant didn't do it."  Thus, "when the trial court decided whether to award the . . . reduction, it erred in failing to consider the reasons for which [Barner] refused to plead to the entire

24

indictment, along with the apparent validity of those reasons." *Rodriguez*, 975

F.2d at 1009. We therefore remand for reconsideration of this issue by the district

court. *Id.*

### The Adjustment for Possession of a Firearm

Barner argues that the district court erred in increasing his offense level,

based upon the use of firearms during the robbery of ecstasy dealer Michael

Ogburn. Pursuant to Sentencing Guideline § 2D1.1(b)(1), a defendant receives a

two-level enhancement if "a dangerous weapon (including a firearm) was

possessed." U.S. Sentencing Guidelines Manual § 2D1.1(b)(1) (2008). A co-

conspirator's possession of a firearm may result in a defendant receiving a firearm

enhancement if the government proves by a preponderance of the evidence that:

> (1) the possessor of the firearm was a co-conspirator, (2) the possession was
> in furtherance of the conspiracy, (3) the defendant was a member of the
> conspiracy at the time of possession, *and* (4) the co-conspirator possession
> was reasonably foreseeable by the defendant.

*United States v. Gallo*, 195 F.3d 1278, 1284 (11th Cir. 1999).

While the jury acquitted Barner of the drug trafficking conspiracy charge, the

district judge found by a preponderance of the evidence that there was a conspiracy

in which Barner was a participant. This finding is amply supported by the record.

Although Barner did not personally participate in the armed robbery of Michael

25

Ogburn's home from which the ecstasy that he was convicted of possessing was stolen, he had participated in four or five home invasion robberies *before* the Ogburn robbery, and he participated with his co-conspirators in a second home invasion of the Ogburn home one month later, with the intention of stealing more ecstasy and money. Moreover, there is no dispute that all of the home invasions committed by this group of co-defendants involved the use of at least one, and often several firearms. Under these circumstances, it was reasonably foreseeable that his co-conspirators used firearms in the Ogburn robbery during which the ecstasy underlying the count of conviction was stolen. Consequently, the district court did not clearly err by applying a two-level enhancement for possession of a firearm to Barner.

**Barner's Role in the Offense and Criminal History Category**

Barner also challenges the denial of his application for a downward adjustment because of his minor role in the offense, as well as the calculation of his criminal history category. These claims are without merit and do not require extended discussion. A district court's determination of a defendant's role in an offense is a finding of fact, to be reviewed for clear error. *United States v. DeVaron*, 175 F.3d 930, 934 (11th Cir. 1999) (en banc). Moreover, the defendant seeking such a downward adjustment bears the burden of proving his mitigating

role in the offense by a preponderance of the evidence. *Id.* at 945.  After reviewing the record, we conclude that the district court's determination on this issue did not constitute clear error.

We likewise conclude that the district court did not err by assigning criminal history category points based on a disposition of a prior offense in Georgia, in which Barner received what is characterized in Georgia as a "First Offender" discharge.  Under the Georgia statutory scheme, "once the offender completes his sentence—whether on probation or in prison—he is discharged without an adjudication of guilt, and consequently does not suffer the civil disabilities normally suffered by those who have been adjudged guilty of an offense under Georgia law." *See Moore v. Kemp,* 809 F.2d 702, 727-28 (11th Cir. 1987) (en banc), *citing* O.C.G.A. § 42-8-60 (1985).  Nevertheless, "if he committed a new crime, [the defendant] could lose the benefit of his first offender status, and his unadjudicated guilty plea . . . would be considered a prior conviction for the purposes of the habitual offender act." *Id.* at 809 F.2d at 727-28, *citing* O.C.G.A. § 17-10-7(a) (Supp. 1985).  Under these circumstances, Barner's claim that "[t]he awarding of criminal history points for this offense completely contradicts the order of the Clayton County judge and the First Offender Act," is plainly without merit.  Moreover, the Sentencing Guidelines mandate the imposition of criminal

27

history points, even if doing so undermined the purpose of the Georgia's First Offender Act.  U.S. Sentencing Guidelines Manual § 4A1.2 & n.9 & n.10 (2008). Indeed, we have so held in comparable circumstances.  *See United States v. Jones*, 910 F.2d 760, 761 (11th Cir. 1990); *see also Hagins v. United States*, 267 F.3d 1202, 1207-08 (11th Cir. 2001).

## CONCLUSION

We affirm the judgment of conviction and remand for resentencing.  We have not discussed the substantive reasonableness of the sentence, because such an exercise cannot be undertaken until errors we have identified are addressed by the district court.  *See Gall*, 552 U.S. 38, 128 S.Ct. at 597 ("[a]ssuming that the district court's sentencing decision is procedurally sound, the appellate court should then consider the substantive reasonableness of the sentence imposed under an abuse-of-discretion standard.").

A True Copy Attested
Clerk U.S. Court of Appeals,
Eleventh Circuit

By: _____
Deputy Clerk
Atlanta, Georgia